UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

   -v-                                              CASE NO: 5:17-CR-0309 (BSK)

CHARLES POLTENSON,
                Defendant.

---

# **SENTENCING MEMORANDUM OF DEFENDANT CHARLES POLTENSON**

DATED: March 30, 2018                    Respectfully submitted,

                                                  LISA A. PEEBLES
                                                  Federal Public Defender

                                     By:    Courtenay K. McKeon, Esq.
                                              Assistant Federal Public Defender
                                              Bar Roll No. 515841
                                              Clinton Exchange, 3rd Floor
                                              4 Clinton Square
                                              Syracuse, New York 13202
                                              (315) 701-0080

On October 18, 2017, Defendant Charles Poltenson ("Charlie") pleaded guilty to a three-count information charging him with violating 18 U.S.C. § 2251(a) by producing child pornography. (Dkt. No. 15.) As set forth in the plea agreement (Dkt. No. 17), there is no allegation that Charlie ever had any physical contact with any minor, or indeed that he ever met any of the minors with whom he interacted online in person. Sentencing is scheduled for April 13, 2018. (Dkt. No. 18.)

The United States Probation Department prepared a Presentence Investigation Report (*hereinafter* "PSR") on February 22, 2018, in anticipation of sentencing. (Dkt. No. 24.) The PSR sets forth a total offense level of 43 (after acceptance) and a Criminal History Category of I. (Dkt. No. 24 ¶¶ 55, 60.) The defense has no objection to the calculation of the offense level or the criminal history category. The defense has submitted factual and legal objections to Probation regarding other matters.

The defense submits this memorandum in support of its contention that the Court should sentence Charlie to fifteen years of incarceration or less.

**I.   FACTUAL BACKGROUND**

Charlie was born in August 1989, about one month premature. (Dkt. No. 24 ¶ 62; Report of John Matthew Fabian, Exhibit A at 4.) Very early on, his parents, Charles and Theresa, noticed that Charlie was not developing in a typical way. He did not want to nurse and did not look at his mother at all. *Id*. As Charlie grew older, he did not cry or make any noises. *Id*. Pediatricians tested Charlie's hearing and found that it was normal. *Id*. According to his mother:

> I brought him to pediatricians and they said everything was okay. But as his mother, I knew something was wrong. By two years old, he did not grow out of it. He never said anything. He never talked. He was the quietest child you ever imagined. I had concerns because he did not look at me. He never made any noises when he was playing. He never looked at anybody, never played with anybody. He was so quiet, it was scary.

1

*Id*. at 4-5. Charlie finally began to speak, to a limited degree, when he was about three years old. *Id*. at 5.

When Charlie was about eighteen months old, he was diagnosed with Asperger's Syndrome. (Ex. H, letter of support from Theresa Poltenson.) Asperger's Syndrome is defined in the DSM-IV as an autism spectrum disorder characterized "by extreme social and emotional immaturity, the inability to 'read' others or respond appropriately in social settings, lack of intuitive awareness of social/moral/legal constraints, and intense and narrowly directed activities." Ami Klin, Fred Volkmar, et al., *Principles for Prosecutors Considering Child Pornography Charges Against Persons With Asperger's Syndrome*, Asperger/Autism Network, www.aane.org/principles-for-prosecutors (last visited Mar. 30, 2018).

Like most children with special needs, Charlie was evaluated for an Individualized Education Program ("IEP"). Charlie's first IEP was prepared before he began kindergarten in the Liverpool Central School District. (Ex. B.) He continued to be educated under an IEP until he graduated from high school in 2007. (Exs. C-F.) A recurrent theme in Charlie's IEPs was his need for guidance and training in order to maintain conversation in a typical way. (See, e.g. , Ex. B at 2, Ex. C at 2, Ex. D at 4; Ex. E at 1; Ex. F at 3.) Teachers noted that he had difficulty with eye contact, topic maintenance, and maintaining an appropriate rate and volume of speech. *Id*.

Charlie found it very difficult to make friends. (Ex. A at 3-4.) Like many people with Asperger's, Charlie found it difficult to pay attention to things he did not like, obsessed over things he did like, had difficulty reading facial expressions and tones of voice, and had difficulty "foretell[ing] peoples' feelings." *Id*. at 13. Other children made fun of the way he looked and talked. *Id*. at 3. He found it much easier to deal with adults than to deal with children. (Ex. H at 1.) He did not have real friendships until his middle school and high school years, when he met some other boys who shared his interests, such as the role-playing game Dungeons and Dragons

and the online game World of Warcraft. (Ex. A at 4; Dkt. No. 24 ¶ 65.) Eventually, in addition to these platonic friendships, Charlie developed occasional romantic relationships with young women his own age. (Ex. A at 11; Dkt. No. 24 ¶ 73.) Even in these better times, though, Charlie continued to be bullied by peers. (Ex. H at 1.) At one point he began coming home with bruises on his arms and back because he was being pushed by other kids on the stairs at the high school. *Id*. When Charlie's parents reported the issue to the principal, they were told that they were too many students in the hallway for the school to intervene. *Id*.

Charlie was very close to his parents as a child, particularly his father. They participated in many activities together such as Cub Scouts and Civil War reenacting. (Ex. G.) Charlie favored his father over his mother as a child because his father's form of discipline was to be diplomatic and talk to him about issues. (Ex. A. at 3.) However, at a Civil War reenactment during Charlie's teen years, he witnessed his father cheating on his mother. (Dkt. No. 24 ¶ 63.) Charlie confronted his father and told him that he needed to confess to Charlie's mother within a week or else Charlie would tell her. (Dkt. No. 24 ¶ 63; Ex. A at 2-3.) As Charlie sees it, his father instead used that week to negotiate a separation agreement that was devastating to his mother. *Id*. Charlie also discovered email messages that his father wrote during that week in which he disparaged Charlie for his "learning disability" and "irrational thoughts." *Id*. After the divorce, Charlie became closer to his mother. (Ex. A at 3.) He worries nearly constantly about the effect his arrest, conviction, and incarceration will have on her. *Id* at 15.

His parents' divorce—combined with the effects of his girlfriend, Carolyn, breaking up with him—led Charlie to attempt suicide using a pistol in 2009. (Dkt. No. 24 ¶ 73.) The pistol jammed and Charlie did not attempt suicide again. *Id*. However, he continued to research ways to kill himself from that day until the date of his arrest. *Id*.

3

It was during this time period, when he was about twenty years old, that Charlie began engaging in sexual conversations online with minors. (Ex. A at 18; Dkt. No. 24 ¶ 20.) He had first been exposed to child pornography as a very young child, at about age seven. (Ex. A at 9; Dkt. No. 24 ¶ 19.) He discovered it when he tried to look himself up online using his initials—"CP." *Id*. He found the pictures intriguing because they depicted girls his own age. (Ex. A at 9.) He did not view child pornography again until he was about thirteen years old and received his first computer. (Dkt. No. 24 ¶ 19.) He viewed pornography frequently from age thirteen to age seventeen, when he began dating Carolyn. *Id*. After their breakup, he began viewing it again. *Id*. As Charlie explained to Dr. Fabian, he liked the same things about child pornography that he liked about adult pornography: "The willingness, mainly like selfie portraits. [T]he things I disliked were if it was a rape it wouldn't matter [if] it was an adult or a child, I wouldn't like it." (Ex. A at 10.) He did not like videos and images where it looked as if the minors had been forced. *Id.* at 18. Charlie's distaste for those types of images, combined with his own low self-esteem and hunger for connection with other people, led him to begin talking to minors online. (Dkt. No. 24 ¶ 20; Ex. A at 18.) Charlie felt that the girls were choosing to share photographs and videos with him rather than being forced. At first he talked to people his own age, and then to progressively younger girls. (Ex. A at 18.) He wanted to feel appreciated and loved. *Id*. He enjoyed the social interaction and "really didn't discriminate as long as they were willing and interested." *Id*. at 11.

As Charlie admitted in his plea agreement, he used Skype to persuade underage girls to masturbate or show him their genitalia. (Dkt. No. 17 ¶ 5(b).) The victims in this case include three girls who sent him such videos. *Id*. ¶ 5(d).  Charlie knew that what he was doing was wrong, but he was afraid to ask for help. (Ex. A. at 14, 19.) He would quit for several days or a

4

week and then begin again. *Id*. Charlie knows that what he did was a betrayal of anyone who ever trusted him, including his victims. (Dkt. No. 24 ¶ 20.)

On February 12, 2016, Charlie was arrested at his home. (Dkt. No. 24 ¶ 9.) He has been in custody ever since.

## II. THE COURT SHOULD IMPOSE A BELOW-GUIDELINE SENTENCE BECAUSE THE GUIDELINE RANGE IS OVERLY SEVERE AND INCOMPATIBLE WITH THE APPLICABLE STATUTORY FACTORS.

The defense requests that the Court to impose a below-Guideline sentence in this case because the Guideline range applied to Charlie's case is overly severe and incompatible with the applicable statutory factors.

### A. The Guideline Sentencing Range is "Life" Rather than 1,080 Months (90 Years).

The United States Sentencing Commission Guidelines serve as "the starting point and the initial benchmark" for all sentencing proceedings. *Gall v. United States*, 552 U.S. 38, 46, 49 (2007). Accordingly, it is vital that the Guideline sentence be properly calculated.

Several subsections of the Guidelines must be applied to determine the Guideline sentence where, as here, a defendant is guilty of multiple counts. First, under Guideline § 5G1.2(b), "the court shall determine the total punishment and shall impose that total punishment on each count." U.S. Sentencing Guidelines Manual § 5G1.2(b) (U.S. Sentencing Comm'n 2016). The Guidelines define "total punishment" as the total "determined by the court after determining the adjusted combined offense level and the Criminal History Category and determining the defendant's guidelines range on the Sentencing Table in Chapter 5, Part A." U.S. Sentencing Guidelines Manual § 5G1.2 cmt. n.1 (U.S. Sentencing Comm'n 2016). Here, the adjusted combined offense level is 43 (PSR ¶ 54) and the Criminal History Category is I (PSR ¶ 60), resulting in a Sentencing Table range of life. Thus, the "total punishment" for the purposes of

5

Guideline § 5G1.2(b) is life. In order to impose a Guideline sentence, then, the Court would impose a life sentence on each count.

The PSR cites no authority for a Guideline sentence of 1,080 months - a sum reached by adding together the statutory maximum term for each count. (PSR ¶ 87.) Other reports prepared by the Probation Office cite Guideline 5G1.2(b) to support calculating the Guideline in this fashion. There is no support in Guideline § 5G1.2(b) for calculating the "total punishment" in that manner.

The Guidelines' only support for "stacking" statutory maximum sentences in anything like this manner is found in Guideline § 5G1.2(d). Guideline § 5G1.2(d) states that:

> [i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentences imposed on one or more of the other counts shall run consecutively, *but only to the extent necessary to produce a combined sentence equal to the total punishment.* In all other respects, sentences on all counts shall run concurrently.

Sentencing Guidelines Manual § 5G1.2(d) (U.S. Sentencing Comm'n 2016) (emphasis added). The emphasized language expresses the long-standing preference in American courts for concurrent sentences rather than consecutive sentences. *See* 18 U.S.C. § 3584(a) ("Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively."); *United States v. Martinez*, 274 F.3d 897, 903 n.5 (5th Cir. 2001) (characterizing § 5G1.2 as "labeling concurrent sentences as the default"); *United States v. Hardrich*, 707 F.2d 992, 993 n.1 (8th Cir. 1983) (noting that the National Advisory Commission on Criminal Justice Standards and Goals "recommends a presumption in favor of concurrent sentences for multiple offenses").

As the plain language of Guideline § 5G1.2(d) makes clear, if imposing a Guideline sentence, the Court is authorized to impose consecutive maximum sentences *only to the extent necessary* to produce a combined sentence of *life*. There are two different standards the Court

6

could consult in order to determine the length of a life sentence in years or months. First, the United States Sentencing Commission defines a life sentence as 470 months (39.2 years). United States Sentencing Commission, *Life Sentences in the Federal System*, (Feb. 2015). Second, the Social Security Administration calculates that a man, like Charlie, born on August 7, 1989, can expect to live, on average, until age 82.2. SOCIAL SECURITY ADMINISTRATION, CALCULATORS: LIFE EXPECTANCY, https://www.ssa.gov/OACT/population/longevity.html. A life sentence, then, would be a sentence of 53.6 years (643.2 months). *Id*. Accordingly, the Guideline sentence in this case is life (defined in either by either of the two suggested standard or another rubric) rather than 1,080 months. In order to achieve a properly-calculated Guideline sentence, the Court could impose consecutive thirty-year sentences on Counts 1 and 2 along with a concurrent sentence on Count 3. It is not necessary to impose consecutive maximum sentences on each count in order to achieve a Guideline sentence.

As discussed in more detail below, the defense requests a below-Guideline sentence of fifteen or fewer years. However, the defense requests that the Court identify the Guideline sentence as life rather than as 1,080 months.

> **B. A Below-Guideline Sentence is Appropriate Because of the Interplay Between Charlie's Asperger's Syndrome and His Offense Conduct, the Ubiquity of "Sexting" Among Young People, the Unrefuted Expert Opinion that Charlie Poses a Low Risk of Reoffending, and the Lack of Appropriate Mental Health Care in Prison.**
>
> 1. <u>This Court has the discretion to sentence Charlie below the Guidelines range</u>.

As noted above, the United States Sentencing Commission Guidelines serve as "the starting point and the initial benchmark" for all sentencing proceedings. *Gall v. United States*, 552 U.S. 38, 46, 49 (2007). However, following the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220 (2005), the Guidelines are only advisory. They are not mandatory. In determining a sentence, a Court must take into account the statutory concerns listed in 18 U.S.C.

§ 3553 (a)(2) as well as the defendant's unique circumstances. *See* 18 U.S.C. § 3553 (a). A district court should not presume a Guideline sentence will always satisfy § 3553(a), because the Guidelines are only "a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 351, (2007); *Booker*, 543 U.S. at 245. A court is free to reject a Guideline sentence when "the Guidelines sentence itself fails properly to reflect §3553(a) considerations." *Rita*, 551 U.S. at 350–51. Here, the Guideline fails to properly reflect those considerations.

    2. <u>The Guideline sentence of life fails to properly reflect the § 3553(a) factors.</u>

18 U.S.C. § 3553(a) includes a list of "factors" a court is to consider when determining the appropriate sentence ("the § 3553(a) factors"). The court must consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed— (A) to reflect the seriousness of the offense, to promote respect for the law; and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Here, each of these factors militate towards sentencing Charlie below the Guideline range.

    a. *The history and characteristics of the defendant*

Charlie's history and characteristics weigh in favor of a short prison sentence. As noted above, Charlie was diagnosed as a toddler with Asperger's Syndrome. There is a wealth of scholarship about the connection between Asperger's Syndrome and child pornography. *See, e.g.*, Mark Mahoney, *Asperger's Syndrome and the Criminal Law*. https://www.harringtonmahoney.com/content/Publications/AspergersSyndromeandtheCriminalLawv26.pdf (last visited Mar. 30, 2018) (collecting scholarship). Many of the behaviors that are

8

markers of Asperger's Syndrome exacerbate an individual's likelihood of engaging with child pornography. *Id*. at 39-44. First, individuals with Asperger's frequently have intense curiosity and express that curiosity through obsessive collecting. *Id*. at 40. Thus, explains Mahoney, "an AS individual's extensive collection of child pornography may not really be about the sexually explicit depictions at all, but simply about collecting similar images." *Id*. As Charlie told Dr. Fabian, most of his child pornography collection "was just plain and simple hoarding." (Ex. A at 11.) Second, people with Asperger's Syndrome "interpret the world around them extremely literally" and, as a result, "may not believe that something readily available on the internet would also be illegal and considered morally reprehensible." Mahoney at 41. Third, individuals with Asperger's often have a "lethal combination" of technological skill and social naiveté that allows them to access child pornography without understanding "the cultural value assigned to images" that they are seeing. *Id.* Fourth, the difficulty that individuals with Asperger's have with reading social cues means that, when viewing child pornography, they "fail to recognize the abused children's anguish or anxiety." *Id*. at 43.

Charlie's experience reflects Mahoney's description. Charlie craves connections with other people. It is extremely difficult for him to form those connections in person because of his inability to read social cues and the insecurity that developed as a result of being bullied and isolated by peers. Those feelings of isolation increased after his parents' divorce and his girlfriend's ending of their two-year relationship. As Dr. Fabian explains in his report, Charlie had "given up on trying to connect interpersonally with female peers his age" and turned to the internet "as an instructive tool to discover how to approach basic social skills" which "unknowingly took him into forbidden territory." (Ex. A at 37-38.) Charlie's Asperger's played a major role in his offense conduct.

9

In addition to the connections between Asperger's and Charlie's offense conduct, his condition is relevant for a second reason. Individuals with Asperger's are at increased risk during incarceration. They are "likely to be victims in prison" because "their failure to interpret or deflect others' manipulations, combined with their social anxiety and inability to defend themselves or effectively manipulate any social encounter" makes them vulnerable. Mahoney at 50. Thus, a below-Guideline sentence is warranted to protect Charlie, given his history and characteristics.

The PSR notes Charlie's Asperger's diagnosis as a factor that may warrant a sentence outside of the Guideline system. (Dkt. No. 24 ¶ 105.) Accordingly, a below-Guideline sentence is appropriate.

b.  *The nature and circumstances of the offense*

There is a wide range of criminal behavior that is punished under 18 U.S.C. § 2251(a). The statute encompasses everything from internet-only communication to offenses like that of Stephen Howells, who kidnapped two girls, held them captive, drugged them, and made movies of himself raping them. *See United States v. Howells*, No. 5:14-CR-0340 (GTS).  The Guidelines generally suggest a life sentence for any offense covered by § 2251(a), from the most minor to the most horrific. The Guidelines' failure to distinguish between such different offenses suggests that a below-Guideline sentence is appropriate in cases like Charlie's at the less horrific end of the § 2251(a) spectrum.

As the plea agreement in this case makes clear, it has never even been alleged that Charlie had in-person sexual contact with any minor. Charlie's crimes all occurred over the internet. Charlie's crimes fall under the umbrella of the phenomenon known as "sexting."

"Sexting" is a cultural phenomenon in which young people participate with alarming frequency. Depending on the study, somewhere between 4% and 20% of teenagers report that

10

they have sent sexually suggestive text messages to another teen. According to a 2008 report by The National Campaign to Prevent Teen and Unplanned Pregnancy (NCPTUP), 20% of teenagers ages 13-19 have "electronically sent, or posted online, nude or semi-nude pictures or video of themselves." Nat'l Campaign to Prevent Teen and Unplanned Pregnancy, Sex and Tech: Results from a Survey of Teens and Young Adults 1 (2008), http://www.thenationalcampaign.org/sextech/PDF/SexTech_Summary.pdf; see infra Part I (discussing some of the limitations in the methodology underlying this poll). A narrower 2009 survey by the Pew Internet & American Life Project focused exclusively on cell phone transmission of images, finding that 4% of teenagers ages 12-17 who own cell phones "report sending a sexually suggestive nude or nearly-nude photo or video of themselves to someone else." Amanda Lenhart, Pew Internet & American Life Project, Teens and Sexting: How and Why Minor Teens Are Sending Sexually Suggestive Nude or Nearly Nude Images Via Text Messaging 4 (2009), http://www.pewinternet.org/~/media//Files/Reports/2009/PIP_Teens_and_ Sexting.pdf.

By the mid-teens, the human brain's reward centers linked to emotional and sexual arousal are well-developed. However, the prefrontal cortex, which connects reasoning with emotion and enables people to weigh consequences, is not fully formed until the mid-twenties.[1] The confluence of a developed reward center and underdeveloped impulse control make risky behavior an issue for all adolescents. This is why when it comes to exchanging sexual images of themselves, an Associated Press poll found that one-third of teenagers sexted even though over 70% recognized that doing so may have serious consequences[2]. The availability of digital messaging applications enables adolescents to act on their impulsivity and curiosity while

---

[1] Dennis, E.L & Thompson, P.M. Typical and Atypical Brain development: A Review of Neuroimaging studies (2013);  Stiles, J. & Jennigan, T.L. The Basis of Brian development."
[2] One-third have sent or received "sext" messages on their phones or online, with 71 percent describing sexting as a serious problem. Only 15 percent of the 14-24 year olds polled said they have shared naked photos or videos of themselves. http://www.wired.com/2009/12/sexting-survey/

11

diminishing their inhibitions under the guise of anonymity. *Psychology of the Digital Age: Humans Become Electric* by John Suler.

Charlie's personal history and age made him particularly susceptible to digital disinhibition. While Charlie began his offense behavior at age twenty rather than as a teenager, his Asperger's diagnosis means that he lags years behind his peers in social and emotional development. Mark Mahoney, *Asperger's Syndrome and the Criminal Law*. https://www.harringtonmahoney.com/content/Publications/AspergersSyndromeandtheCriminalLawv26.pdf (last visited Mar. 30, 2018). He is remarkably socially and emotionally immature. Dr. Fabian performed a battery of clinical tests and observations and opined that Charlie is "emotionally disabled with marked difficulty in social and emotional interconnectedness." (Ex. A at 37.) According to Dr. Fabian, Charlie "had a compromise in social and emotional development and would have a tendency to connect with individuals that were along his same emotional development." *Id*. Thus, although Charlie was not chronologically a teenager when he committed the offenses to which he has pleaded guilty, his brain functioned like that of a teenager.

Charlie was an adult—albeit one with serious emotional and maturity deficits due to his Asperger's syndrome— and his victims were children and he asked them to do things they never should have been asked to do. But Charlie's conduct—while unlawful, morally wrong, and troubling—was far less heinous than many other crimes that violate the same statute. Charlie did not force himself physically on anyone. He did not touch anyone. He was never in the same room with any of his victims. He did not threaten or blackmail the girls. Accordingly, the nature and circumstances of the offense weigh in favor of a below-Guideline sentence.

12

        c.   *The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

A below-Guideline sentence would be sufficient to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. As discussed above, Charlie's conduct, while criminal, falls at the least culpable end of the spectrum of the conduct covered by 18 U.S.C. § 2251(a). A below-Guideline sentence would distinguish his case from cases like Stephen Howells', discussed above. Moreover, individuals convicted under state law for far more heinous offenses receive significantly shorter sentences than the Guideline sentence of life called for in this case. *See, e.g.*, Douglas Dowty, *Mattydale Karate Instructor Admits Oral Sex with 2 Teen Girls, Gets 6 Months in Jail*, Syracuse.com (Mar. 21, 2018) http://www.syracuse.com/crime/index.ssf/2018/03/cny_karate_instructor_admits_oral_sex_with_2_teen_girls_gets_6_months_in_jail.html. In light of the lenient state court sentences such as these, even a sentence significantly below the Guideline would demonstrate to the public that the federal courts view any violation of 18 U.S.C. § 2251 as a serious offense.

        d.   *The need for the sentence imposed to afford adequate deterrence to criminal conduct*

A below-Guideline sentence would be sufficient to afford adequate deterrence to criminal conduct. Studies of the deterrent effect of prison sentences have found that it is the prosecution of crime, rather than the sentence imposed, that has the strongest deterrent effect. In one of the best studies of specific deterrence, which involved federal white collar offenders in the pre-guideline era, no difference in deterrence was found between probation and imprisonment. Another study by the Institute of Criminology at Cambridge University examined the effects of changes to both the *certainty* and the *severity* of punishment. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence

13

severity and crime rates . . . were not sufficient to achieve statistical significance." *See* David Weisburd et. al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995). Accordingly, this factor weighs in favor of the Court imposing a below-Guideline sentence.

        e. *The need for the sentence imposed to protect the public from further crimes of the defendant*

A below-Guideline sentence would be sufficient to protect the public from further crimes of the defendant. Dr. Fabian unequivocally opines that Charlie "presents as a low risk for further sex offending, especially if he has supervised access or no access to the internet." (Ex. A at 39.) Although the government opines that "[i]t is frightening to consider what activity the defendant may next pursue if this escalation is allowed to continue," there is no authority cited for that speculation. (Dkt. No. 26 at 5.) The only expert opinion before the court, Dr. Fabian's, states clearly that Charlie is a low risk for further sex offending.

In addition to the uncontroverted expert opinion that is specific to Charlie himself, statistics about similarly situated defendants demonstrate that Charlie is a low risk for recidivism. Defendants in Criminal History Category I whose base offense level is 31-43 have only an 11.1% recidivism rate. *Measuring Recidivism: the Criminal History Computation of Federal Sentencing Guidelines* at 30 (May 2004). Although the Supreme Court has stated that sex offenders have a recidivism rate "as high as 80%," that figure has recently been shown to have been derived from one unscientifically supported article in a 1986 edition of Psychology Today, which the author himself has since repudiated. David Feige, *When Junk Science About Sex Offenders Infects the Supreme Court*, N.Y. Times, Sept. 12, 2017, found at https://www.nytimes.com/2017/09/12/opinion/when-junk-science-about-sex-offenders-infects-the-supreme-court.html; Joshua Vaughn, *Closer Look: Finding Statistics to Fit a Narrative*, The Sentinel, Mar. 25, 2016, found at http://cumberlink.com/news/local/closer_look/closer-look-

finding-statistics-to-fit-a-narrative/article_7c4cf648-0999-5efc-ae6a-26f4b7b529c2.html. Accordingly, a below-Guideline sentence would be sufficient to protect the public from further crimes of the defendant.

> f. *The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner*

A below-Guideline sentence would be the most appropriate way to provide Charlie with needed treatment. Dr. Fabian notes that Charlie "obviously needs psychological based therapies that would be related to low functioning individuals with very poor social skills. His therapist would also definitely need to have some background and insight into autism spectrum disorder. It would also be a good idea for him to engage in some type of group therapy to better develop social skills in a group setting." (Ex. A at 39.) While group sex offender training is available in some Bureau of Prisons facilities, it is highly doubtful that those facilities also employ individuals with background and insight into autism spectrum disorder. *See* Jennifer M. Reingle Gonzalez, Nadine M. Connell, *Mental Health of Prisoners: Identifying Barriers to Mental Health Treatment and Medication Continuity*, 104 American Journal of Public Health 12 2014 (finding that a significant portion of prisoners do not receive treatment for mental health conditions). Therefore, this factor weighs in favor of a below-Guideline sentence.

## III. THE COURT SHOULD IMPOSE A SENTENCE BELOW THE MANDATORY MINIMUM BECAUSE THE MANDATORY MINIMUM SENTENCE CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT.

Before the advent of the internet, the fifteen-year mandatory minimum for producing child pornography was good policy. At that time, "production and duplication of [child pornography] required expensive equipment of the kind not normally found in the average home. To distribute images of child abuse, one had to either personally transport them or rely on a domestic mail carrier." Erik Faust, *et al., Child Pornography Possessors and Child Contact Sex*

15

*Offenders: A Multilevel Comparison of Demographic Characteristics and Rates of Recidivism.*

Now, however, it takes far less malevolent intent and planning to produce child pornography.

The Sentencing Commission itself has acknowledged the impact of technology:

> These technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre that previously was not as widely circulated as it is today. As a result of such changes, entry-level offenders now easily can acquire and distribute large quantities of child pornography at little or no financial cost and often in an anonymous, indiscriminate manner.

U.S. Sentencing Comm'n, *Federal Child Pornography Offenses* (Dec.2012), at 312–13 In light of these technological advances, a fifteen-year mandatory minimum sentence is unconstitutionally cruel and unusual.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. The Supreme Court has long indicated that a sentence may, in rare cases, be so disproportionate to the seriousness of the underlying offense that it violates the Eighth Amendment. *Weems v. United States*, 217 U.S. 349, 368 (1910). In determining whether a sentence is unconstitutional as applied to a particular defendant, a court must compare the gravity of the offense and the harshness of the penalty; to do so a court should review a number of factors including: culpability of the defendant, crimes of conviction, criminal history, the harm or threat to the victim(s), the magnitude of the crime, the defendant's age, and the true length of imprisonment. *See Solem v. Helm*, 463 U.S. 277, 288 (1983); *Ewing v. California*, 538 U.S. 11, 29 (2003); *Rummel v. Estelle*, 445 U.S. 263, 275 (1980). Taken together, a review of these factors in the present case creates a strong inference that the punishment Charlie faces is disproportionate to the crime he committed.

There is no denying that Charlie's offense is very serious in nature. However, the *Solem* Court emphasized that the fact that an offense does not actually require proof that the defendant

16

inflicted any bodily harm generally makes that offense less serious than an offense that does. *Solem*, 463 U.S. at 292-93. Here, Charlie never made physical contact with his victims at all. While, as the victim impact statements make clear, the girls have suffered psychological trauma that cannot and should not be minimized, they did not suffer bodily harm.

As discussed above, "sexting" is an increasingly common activity. The fact that so many other adolescent boys and girls are doing what Charlie did does not by any means excuse his conduct. It does however suggest that the gravity of the offense is disproportionate to a fifteen-year mandatory minimum prison sentence. If the federal criminal justice system is intent on prosecuting so severely the type of crime Charlie committed, then the United States will need to build more prisons. Charlie's offense was a non-contact offense. His crime should not be generalized with crimes that are often connected with contact offenses. Therefore, this information considered with Charlie's youth, susceptibility to disinhibition, and the brutality he faces in prison demonstrate that a fifteen year sentence for Charlie is not proportionate to his crime. Accordingly, the defense requests that the Court to impose a sentence below the fifteen-year mandatory minimum.

### IV. THE TIME CHARLIE HAS SERVED IN STATE CUSTODY SHOULD COUNT TOWARD HIS FEDERAL SENTENCE

Charlie was arrested and placed into state custody on February 12, 2016.[3] He made his first appearance in federal court on January 13, 2017. The PSR asserts that Charlie has remained in state custody and has not served any federal time. (Dkt. No. 24 ¶ 7.) The docket in this case indicates otherwise.

---

[3] State charges remain pending. Charlie's state court attorney has advised federal defense counsel that the state charges will be dropped after Charlie is sentenced by this Court.

The PSR asserts that Charlie was "produced on a writ of habeas corpus from state custody on January 13, 2017." (Dkt. No. 24 ¶ 7.) It is true that a writ was issued. (Dkt. No. 3.) However, Charlie was produced pursuant to a federal arrest warrant that was executed on January 13, 2017. (Dkt. No. 4.) The text minute entry for Charlie's initial appearance in federal court indicates that the government moved for detention. The defense waived Charlie's right to a detention hearing because, even if released from federal custody, he would have remained in state custody. This does not mean that Charlie remained in sole state custody. Importantly, the text minute entry does not state that Charlie waived his rights under the Interstate Agreement on Detainers. No such waiver was filed, as is the general practice when a defendant wishes to remain in state, rather than federal, custody. *See, e.g.*, *United States v. Passero*, No. 5:18-MJ-0019 (ATB), Dkt. No. 8; *United States v. Dyer*, 5:16-CR-0233, Dkt. No. 7. At the conclusion of the initial appearance, Charlie was remanded "to the custody of the U.S. Marshals." He was housed at the Cayuga County Jail, which would not be the appropriate placement for an inmate in state custody facing charges in Onondaga County. The federal docket does not indicate that the federal government ever changed its position regarding detention or that the federal court ever ordered that Charlie be released from the federal custody requested by the government. Accordingly, it is the defense's position that Charlie has been in joint federal and state custody since his initial appearance on January 13, 2017.

Charlie has been in custody of one kind or another since February 12, 2016. Charlie requests that he receive credit toward his federal sentence for any time served in state custody. Such credit is appropriate under 18 U.S.C. § 3585(b).

18

## V. CONCLUSION

For the reasons discussed above, the defense respectfully requests that the Court sentence Charlie to a sentence of fifteen years or less of incarceration and credit him for all custody since his arrest on February 12, 2016.

## REQUEST FOR JUDICIAL RECOMMENDATION

The defense requests that the Court recommend that Bureau of Prisons designate that Charlie be placed at either Fort Dix FCI, FMC Butner, or Danbury FCI.

DATED: March 30, 2018

        LISA A. PEEBLES
        FEDERAL PUBLIC DEFENDER
By:   */s/ Courtenay K. McKeon, Esq.*
        Assistant Federal Public Defender
        Bar Roll No. 515841
        Clinton Exchange, 3rd Floor
        4 Clinton Street
        Syracuse, New York   13202
        (315) 701-0080

To:   Geoffrey Brown, AUSA (via ECF)
      Carissa Perez, USPO (via email)
      Charles Poltenson, Cayuga County Jail (via mail)